1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   CONSERVATION CONGRESS, a non-        No. 2:14-CV-02228-GEB-AC
     profit organization,
12
                Plaintiff,
13
                                          **ORDER GRANTING DEFENDANT'S**
14        v.                              **SUMMARY JUDGMENT MOTION AND**
                                          **DENYING PLAINTIFF'S SUMMARY**
15   UNITED STATES FOREST SERVICE,        **JUDGMENT MOTION**

16              Defendant.

17

18        Plaintiff Conservation Congress and Defendant United

19   States Forest Service ("Forest Service") each move for summary

20   judgment on all claims in Plaintiff's Complaint. The County of

21   Siskiyou filed an amicus curiae brief in support of the Forest

22   Service's motion.

23        Plaintiff alleges in its Complaint that the Forest

24   Service's decision authorizing the Environmental Assessment

25   ("EA") and Finding of No Significant Impact ("FONSI") for the

26   Porcupine Vegetation and Road Management Project ("the Project")

27   violated the National Environmental Policy Act ("NEPA") and the

28
                                    1

1  National Forest Management Act ("NFMA"). The Forest Service

2  identified the purposes of the Project as (1) improving forest

3  health by thinning trees, thereby reducing fuels that pose a risk

4  of igniting a catastrophic fire in the Shasta-Trinity National

5  Forest ("the Forest"), (2) maintaining a fuel break, and (3)

6  restoring meadow and aspen habitat. (Project Administrative

7  Record ("PAR") 1, 4, 370, ECF No. 11.) "The project area is

8  located near Porcupine Butte approximately 20 miles northeast of

9  McCloud," California. (PAR 1.)

10  **I. LEGAL STANDARD**

11      "Agency decisions that allegedly violate . . . NEPA and

12  NFMA are reviewed under the Administrative Procedure Act ('APA'),

13  and may be set aside only if they are 'arbitrary, capricious, an

14  abuse of discretion, or otherwise not in accordance with the

15  law.'" Or. Natural Res. Council Fund v. Goodman, 505 F.3d 884,

16  889 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). Agency action

17  is arbitrary or capricious if it fails to "examine the relevant

18  data and articulate a satisfactory explanation for [the] action

19  including a rational connection between the facts found and the

20  choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

21  Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42-43 (1983). Judicial

22  "[r]eview under this standard is to be 'searching and careful,'

23  but remains 'narrow,' and a court is not to substitute its

24  judgment for that of the agency. This is especially appropriate

25  where . . . the challenged decision implicates substantial agency

26  expertise." Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1571

27  (9th Cir. 1993).

28  ///

1    A party seeking summary judgment bears the initial

2 burden of demonstrating the absence of a genuine issue of

3 material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323

4 (1986). If the movant satisfies its "initial burden," "the

5 nonmoving party must set forth, by affidavit or as otherwise

6 provided in Fed. Rule Civ. Proc. ("Rule") 56, 'specific facts

7 showing that there is a genuine issue for trial.'" T.W. Elec.

8 Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630

9 (9th Cir. 1987) (quoting former Rule 56(e)).

> Because a district court has no independent
> duty "to scour the record in search of a
> genuine issue of triable fact," and may "rely
> on the nonmoving party to identify with
> reasonable particularity the evidence that
> precludes summary judgment," . . . the
> district court . . . [is] under no obligation
> to undertake a cumbersome review of the
> record on the [nonmoving party's] behalf.

15 Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir.

16 2010) (quoting Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.

17 1996)).

18    **II. REQUEST TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

19    Plaintiff seeks in its reply brief to supplement the

20 Project Administrative Record ("PAR") by having judicial notice

21 taken of the Forest Service's Annual Progress Report. (Pl.'s

22 Reply Supp. Summ. J. ("Pl. Reply") 2 n.1, ECF No. 31.) However,

23 the district court need not consider a request made for the first

24 time in a reply brief. See Zamani v. Carnes, 491 F.3d 990, 997

25 (9th Cir. 2007).

26    "Generally, judicial review of agency action is limited

27 to review of the administrative record." Animal Def. Council v.

28 Hodel, 840 F.2d 1432, 1436 (9th Cir. 1988). The administrative

record may be supplemented only:

> (1) if necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) "when the agency has relied on documents not in the record,' [] (3) "when supplementing the record is necessary to explain technical terms of complex subject matter," . . . . [or] [4] "when plaintiffs make a showing of agency bad faith."

S.W. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996) (quoting Inland Empire Pub. Lands Council v. Glickman, 88 F.3d 697, 703-04 (9th Cir. 1996)). Plaintiff's request is untimely and does not address the relevant legal standard. Therefore, Plaintiff's request to supplement the administrative record is denied.

### III. DISCUSSION

Plaintiff alleges in its Complaint that the Forest Service violated NEPA by (1) conducting an arbitrary and capricious cumulative effects analysis on the northern spotted owl, (2) failing to consider a reasonable range of alternatives to the Project, (3) failing to take a "hard look" at the environmental impacts of the Project, and (4) failing to prepare an Environmental Impact Statement ("EIS"); and that the Forest Service violated the NFMA by failing to comply with the Forest Plan's snag retention standard.

### A.   Cumulative Impacts of Future Projects

Plaintiff alleges in its Complaint that the Forest Service used an inappropriately narrow geographic boundary for its cumulative impacts analysis to assess the Project's impact on the northern spotted owl. (Compl. ¶¶ 46-47.) Plaintiff argues the narrowness of this analysis fails to comply with the Council on

4

1  Environmental Quality ("CEQ") guidelines that require analyzing

2  the Project's effects using the largest area occupied by the

3  owls, which in this case is the owl's natal dispersal distance of

4  10 to 15 miles, and that the Forest Service abused its discretion

5  when only analyzing the Project's impact using the owls 1.3 mile

6  median home range. (Pl.'s Am. Mot. Summ. J. ("Pl. Mot.") 12:23-

7  13:9; 13:15-25; 14:24-26, ECF No. 20.)

8           NEPA requires that an agency's assessment of the

9  environmental impacts of a proposed Project include an analysis

10  of the action's cumulative impact. Ctr. for Envtl. Law & Policy

11  v. U.S. Bureau of Reclamation, 655 F.3d 1000, 1007 (9th Cir.

12  2011). NEPA regulation 40 C.F.R. § 1508.7 defines cumulative

13  impact as "the impact on the environment which results from the

14  incremental impact of the action when added to other past,

15  present, and reasonably foreseeable future actions . . . .

16  Cumulative impacts can result from individually minor but

17  collectively significant actions taking place over a period of

18  time." "[S]ometimes the total impact from a set of [projects]...

19  may be greater than the sum of the parts." Goodman, 505 F.3d at

20  893. The CEQ publishes guidelines instructing federal agencies

21  how to define the geographic boundaries of a cumulative effects

22  analysis; the guidelines explain: "[a]nalyzing cumulative effects

23  . . . requires the analyst to expand the geographic boundaries

24  [of the analysis] . . . to encompass additional effects on the

25  resources, ecosystems, and human communities of concern" beyond

26  the Project area. (Malone Decl. Ex. A, p. 21, ECF No. 16.) "CEQ's

27  interpretation of NEPA is entitled to substantial deference."

28  Andrus v. Sierra Club, 442 U.S. 347, 358 (1979). The portion of

the guidelines relevant to Plaintiff's claim states: "[f]or a proposed action . . . the analysts should . . . [d]etermine the geographic areas occupied by [the northern spotted owl] . . . . [i]n most cases, the largest of the[] areas [occupied by the owl] will be the appropriate area for the analysis of cumulative effects."(Malone Decl. Ex. A, p. 21, 24)(emphasis added.)

The Forest Service's cumulative effects analysis "includes the effects from habitat modification within an owl's home range, which is an estimated 1.3-mile radius around an activity center (e.g., nest site) or approximately 3,400 acres." (PAR 1291)(emphasis added.)

The Forest Service explains its analysis is "scientifically valid" and consistent with the CEQ guidelines since the owl's natal dispersal distance does not represent the "geographic area [they] occup[y]" but instead "represents the transient/movement phase of young owls . . . en route to establishing new permanent territory." (Fed. Def.'s Mem. Opp'n Pl.'s Mot. Summ. J. ("Def. Opp'n") 2:2-4; 5:4-15, ECF No. 24.)

Further, the Forest Service states in the administrative record, in relevant part:

> The 1.3-mile bounding on the assessment area . . . allows for analysis of . . . adjacent territories, is an accepted range by the [Fish and Wildlife Service] for completing [northern spotted owl] effects analysis and includes managed private timberlands that may influence [northern spotted owl] habitat use within the project assessment area.  The Action Area is approximately 88,657 acres. Although there is only one known [northern spotted owl] activity center and home range in the Action Area . . ., the 1.3-mile buffer area was still assessed to account for any future overlapping activity centers, or partial/entire cores or home ranges(s).

1   (PAR 1291.)

2        "The Forest Service's choice of home range as the
3   physical scope for cumulative effects analysis was not arbitrary
4   or capricious," and there is no evidence indicating that the CEQ
5   guidelines consider the natal dispersal distance a better scope
6   of analysis. Idaho Sporting Congress, Inc. v. Rittenhouse, 305
7   F.3d 957, 974 (9th Cir. 2002)); see also Conservation Congress v.
8   U.S. Forest Serv., 555 F. Supp. 2d 1093, 1108-09 (E.D. Cal. 2008)
9   (approving of cumulative effects analysis that used the northern
10  spotted owl's home range).

11       Therefore, the Forest Service's motion on this claim is
12  granted and Plaintiff's motion is denied.

13       **B.   Failing to Consider a Reasonable Range of Alternatives**

14       Plaintiff argues the Forest Service violated NEPA by
15  failing to consider a reasonable range of alternatives to the
16  Project in its EA. (Compl. ¶¶ 53-56.)

17       Before approving a proposed action, NEPA requires the
18  Forest Service to "study, develop, and describe appropriate
19  alternatives." 42 U.S.C. § 4332(2)(E). "[A]n agency's obligation
20  to consider alternatives under an EA is a lesser one than under
21  an EIS." Ctr. for Biological Diversity v. Salazar, 695 F.3d 893,
22  915 (9th Cir. 2012). "Where with an EIS, an agency is required to
23  'rigorously explore and objectively evaluate all reasonable
24  alternatives,' with an EA, an agency is only required to include
25  a brief discussion of reasonable alternatives." Id. at 915
26  (quoting N. Idaho Cnty. Action Network v. U.S. Dep't of Transp.,
27  545 F.3d at 1153.) "The touchstone of [the] . . . inquiry is
28  whether an [EA's] selection and discussion of alternatives

1  fosters    informed    decision-making    and    informed    public

2  participation." Cal. v. Block, 690 F.2d 753, 767 (9th Cir. 1982).

3  An agency is not required to consider alternatives "beyond those

4  reasonably related to the purposes of the project." Westlands

5  Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 868 (9th

6  Cir. 2004).

7  **1.   Alternative That Would Preclude Logging Trees**

8  **Greater Than or Equal to 21-Inches in Diameter**

9  The Forest Service considered "[a]n alternative that

10  precludes the harvest of trees above . . . 21 inches" in

11  diameter, but did "not consider[] [it] in detail because [the

12  alternative] would not reasonably meet the [P]roject purpose and

13  need." (PAR 99.) Plaintiff argues this conclusion was arbitrary

14  or capricious since it was not supported by evidence and because

15  the Forest Service unfairly considered the 21-inch alternative in

16  combination    with    other    more    restrictive    diameter-based

17  alternatives. (Pl. Mot. 16:5-9; 18:16-20.)

18  The Forest Service responds it was not required to

19  consider the 21 inch alternative in isolation and its analysis

20  sufficiently explained why the alternative did not meet the

21  Project's purpose of improving forest health, since it "would

22  allow disease-infected . . . trees . . . to continue to infect

23  adjacent   young   [trees]"   and   "would   prevent   the   species-

24  composition of mixed stands from shifting back to pine, leaving

25  more stands vulnerable to wildfire." (Def. Opp'n 12:12-22.)

26  The Forest Service discussed the Project's goals in the

27  PAR, specifically stating its objectives included "improve[ing]

28  forest health and growth" and "reducing the risk of catastrophic

8

fire." (PAR 4065-66, 370.)

When considering the 21-inch alternative, the Forest Service stated in part:

> An alternative that precludes the harvest of trees above a set diameter (several upper limits were suggested, including 12, 18 and 21 inches) and larger was not considered in detail because it would not reasonably meet the project purpose and need . . . . An upper diameter limit that excludes overstory tree diameters would not be effective in accomplishing treatment objectives for the following reasons:
>
> • High stocking levels include overstory trees and stocking could not be reduced to desired levels by limiting harvest to trees based solely on dbh [diameter at breast height].
>
> • Disease-infected lodgepole pine overstory trees would continue to infect adjacent young lodgepole pine.
>
> • The species composition of mixed stands . . . on dry, fire-maintained sites would not shift back to pine, leaving stands more vulnerable to wildfire.
> • Aspen would remain overtopped and suppressed by conifers exceeding the diameter limit.

(PAR 99.)

The Forest Service provided "satisfactory explanation[s]" for concluding Plaintiff's alternative would not further the Project's purposes of improving forest health and reducing the risk of catastrophic wildfire, by stating that Plaintiff's alternative would allow disease-infected trees to infect nearby trees, would not properly redistribute the species composition mix in dry areas, and would leave the forest open to catastrophic fires. Motor Vehicle Mfrs. Ass'n of U.S., Inc., 463 U.S. at 43; (see PAR 99.) These rationales apply to the 21-inch

1 | alternative regardless of whether it was considered alone or in
2 | combination with other diameter based logging restrictions. NEPA
3 | does not require the Forest Service to consider alternatives
4 | "beyond those reasonably related to the purposes of the project."
5 | Westlands Water Dist., 376 F.3d at 868. Therefore, the Forest
6 | Service's motion on this claim is granted and Plaintiff's motion
7 | is denied.

### 2. Alternative that Does Not Affect Northern Spotted Owl Habitat

10 | Plaintiff argues that the Forest Service's conclusion
11 | that "an alternative that does not affect [northern spotted owl]
12 | habitat and specifically does not propose activity within
13 | critical, suitable (nesting, roosting, foraging) capable or
14 | dispersal habitat," "fail[ed] to adequately meet the major
15 | aspects of the purpose and need" of the Project is arbitrary or
16 | capricious since the Forest Service's reasoning is contradictory
17 | and inconsistent with prior Forest management decisions. (PAR 99,
18 | 100.)

### a. Contradictory Reasoning

20 | Plaintiff argues the Forest Service's stated reasons
21 | for dismissing the alternative that does not affect northern
22 | spotted owl habitat are inconsistent with each other and
23 | therefore arbitrary.

24 | The Forest Service stated in the relevant part of its
25 | discussion of the alternative:

> The predicted effects of [this alternative]
> (no treatment in critical, dispersal or
> suitable habitat) would be very similar in
> effects to [northern spotted owl] habitat
> under the action alternatives analyzed in

1   detail, as all treated critical foraging and
    dispersal habitat would continue to function
2   as such in both the short- and long-term. . .
    The exception is that capable habitat would
3   remain in its overstocked, stagnant
    condition. . . .

4
    This alternative fails to adequately meet the
5   major aspects of the purpose and need and was
    eliminated from detailed study because:

6
        • Inter-tree competition would not be
7         alleviated within foraging and capable
          stands, and therefore the project would
8         not meet the purpose and need in these
          areas of improving forest health and
9         reducing fuels;

10      • Stand density indices would remain at
          240 to 470 within 17 percent of the area
11        proposed for treatment, continuing to
          result in poor tree health, reduced
12        vigor, increased competition for
          nutrients, light and water, and leading
13        to future disease and mortality
          increases within these adjacent healthy
14        stands;

15      • It would result in increased stress
          induced mortality within suitable and
16        capable habitat, with fewer large
          diameter trees and snags over time
17        (based on growth modeling). . .

18      • It would not encourage or accelerate the
          development of resilient late-
19        successional habitat within current
          suitable habitat, nor protect it from
20        loss resulting from disease or fire.

21  (PAR 100) (emphasis added.)

22          NEPA does not require that the Forest Service consider

23  alternatives "beyond those reasonably related to the purposes of

24  the project." Westlands Water Dist., 376 F.3d at 868. Nor does it

25  "require[] [the Forest Service] to undertake a separate analysis

26  of alternatives which are not significantly distinguishable from

27  alternatives actually considered, or which have substantially

28  similar consequences." Id.

                                    11

1    Plaintiff argues that when the Forest Service dismissed
2    the alternative because it simultaneously did not meet the
3    Project's purpose and was "very similar" to alternatives that met
4    the Project's purpose, its analysis was internally inconsistent.
5    (Pl. Mot. 24:18-27.)

6    The Forest Service responds that it "described several
7    ways in which the proposed alternative would fail to adequately
8    meet . . . the Project's purpose and need" and that "[w]hile the
9    Forest Service recognized that the predicted effects of [other
10   alternatives analyzed in detail] would be similar to the proposed
11   alternative <u>insofar as neither . . . would downgrade or remove</u>
12   <u>northern spotted owl habitat</u>," the similarities did not extend to
13   the Project's purpose of promoting forest health. (Def. Opp'n
14   9:18-19; 10:20-21) (emphasis added).

15   The Forest Service provided a reasoned explanation for
16   its conclusion that Plaintiff's alternative did not meet the
17   Project's purpose of promoting forest health since it would not
18   alleviate inter-tree stress, which causes stress-induced tree
19   mortality. (PAR 99-100.) Its conclusion is reasonable even though
20   the alternative was "very similar" to alternatives that met the
21   Project's purpose and need, since their similarity only concerned
22   their "effects to [northern spotted owl] habitat" and the Forest
23   Service's reasons for determining Plaintiff's alternative did not
24   meet the Project's purpose and need are unrelated to its effects
25   on northern spotted owl habitat. (PAR 100.) For these reasons,
26   NEPA did not require the Forest Service to consider the
27   alternative in further detail. <u>Westlands Water Dist.</u>, 376 F.3d at
28   868 (agency need not consider alternatives "beyond those

12

1    reasonably related to the purposes of the project.").

2          Therefore, the Forest Service's motion on this claim is

3    granted and Plaintiff's motion is denied.

4                    **b.    Inconsistent Reasoning**

5          Plaintiff   argues   that   because   the   Forest   Service

6    decided   at   an   earlier   date   not   to   log   northern   spotted   owl

7    habitat   in   other   parts   of   the   forest,   it   now   cannot   reject   an

8    alternative   that   would   prevent   logging   in   northern   spotted   owl

9    habitat   in   the   Project   area.   (Pl.   Mot.   24:18-23;   22:22-24:5.)

10   Specifically,   Plaintiff   argues   the   Forest   Service   previously

11   considered   logging   northern   spotted   owl   habitat   in   a   part   of   the

12   forest   referred   to   as   the   Porcupine   Late   Successional   Reserve

13   ("LSR"),   but   ultimately   decided   against   logging   there   and,   as   a

14   result,   the   Forest   Service   cannot   now   log   northern   spotted   owl

15   habitat   in   the   Project   area   without   further   explanation.   (Pl.

16   Mot. 24:2-5.)

17         The   Forest   Service   contends   Plaintiff's   focus   on   the

18   LSR   is   a   red   herring   because   of   the   geographic   differences

19   between   the   Project   area   and   the   LSR.   (Fed.   Def.'s   Reply   Supp.

20   Def.'s Mot. Summ. J. ("Def. Reply") 7:15-18, ECF No. 30.)

21         "In   order   to   balance   environmental   and   economic   needs,

22   the   [Forest   Service]   designates   certain   forest   areas   for   logging

23   and   reserves   other   areas,   called   late   successional   reserves

24   (LSRs),   for   conservation."   League   of   Wilderness   Defenders   Blue

25   Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1125 (9th

26   Cir. 2010). LSRs   are   designated   areas   of   forest   land   that   "lie   at

27   the   heart   of   the   [Forest   Service's]   ecosystem-based   conservation

28   strategy   for   the   northern   spotted   owl."   Or.   Natural   Res.   Council

13

1   <u>Fund v. Brong</u>, 492 F.3d 1120, 1126 (9th Cir. 2007). "The . . .

2   LSR [at issue] was established to maintain the few late-

3   successional stands on the far eastern edge of the Shasta-Trinity

4   National Forest and to help provide for connectivity of habitat

5   for late-successional species, including the northern spotted

6   owl." (PAR 274-275.)

7       The Forest Service previously considered, but decided

8   against logging in the LSR in part because "several public

9   commenters expressed concern." (PAR 61.) The Forest Service

10  explained in its EA in relevant part:

11          Prior to the 2012 EA, a similar project that
            additionally included the Porcupine Late
12          Successional Reserve (LSR) was considered in
            a 2009 EA (USDA-FS, 2009a) and decision. The
13          2009 decision was reversed on appeal. The
            Forest Supervisor opted to defer treatment
14          units within the LSR in the Proposed Action
            in the 2012 EA and in this revision. No
15          silvicultural or fuels treatments are
            included in the Porcupine LSR in alternatives
16          considered in detail. While it is recognized
            that the original purpose and need for Action
17          in the LSR is still valid, actions in the
            Porcupine LSR may be considered in a future
18          proposal specific to the Porcupine LSR. Road
            actions in the LSR remain in the action
19          alternatives of this revised analysis."

20  (PAR 44 n.2.)

21      The location of northern spotted owl habitat in the LSR

22  is geographically distinct from the location of northern spotted

23  owl habitat in the Project area. (<u>Compare</u> PAR 2729 (map showing

24  northern spotted owl habitat in the Late Successional Region)

25  <u>with</u> PAR 100 (explaining that northern spotted owl habitat in the

26  Project area is "interspersed").) Specifically, owl habitat in

27  the LSR is contained in a discrete area while habitat in the

28  Project is noncontiguous. (<u>Id.</u>)

1    The geographic distinction, between the LSR and the

2  Project area, combined with the LSR's unique purpose of

3  "maintain[ing] the few late-successional stands on the far

4  eastern edge of the Shasta-Trinity National Forest and to help

5  provide for connectivity of . . . the northern spotted owl," make

6  it reasonable for the Forest Service to reject an alternative

7  that would prevent logging northern spotted owl habitat in the

8  Project area while "defer[ring] treatments . . . within the LSR."

9  (PAR 247-75, 44 n.2.) Therefore, the Forest Service's summary

10  judgment motion on this claim is granted and Plaintiff's motion

11  is denied.

12          **3.    Remaining "Reasonable Range of Alternatives"**

13                  **Claims**

14          The Forest Service seeks summary judgment on

15  Plaintiff's remaining "reasonable range of alternative" claims,

16  in which Plaintiff alleges the Forest Service "considered only

17  near-identical alternatives" and "prepared an unreasonably narrow

18  purpose and need statement." (Compl. ¶¶ 53, 56.) The Forest

19  Service argues it is entitled to summary judgment on these claims

20  since it considered fourteen alternatives and gave detailed

21  consideration to five, which "span a tremendous range, including

22  numerous permutations of actions and treatment locations;" and

23  therefore, the PAR does not support Plaintiff's claims. (Fed.

24  Def.'s Mot. Summ. J. ("Def. Mot.") 15:7-11; 17:17-18, ECF No.

25  13.)

26          Plaintiff did not address these allegations in the

27  Complaint or respond to the Forest Service's arguments.

28  ///

1    The Forest Service prevails on this portion of its

2    motion since it "point[ed] out that there is an absence of

3    evidence to support the nonmoving party's case." <u>Soremekun v.</u>

4    <u>Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).

5    **C.    Failing to Take a "Hard Look" at the Project's**

6    **Environmental Impacts**

7    Plaintiff alleges the Forest Service failed to take a

8    "hard look" at the environmental impacts of the Project. (Compl.

9    ¶ 62.) "The hallmarks of a 'hard look' are thorough investigation

10   into environmental impacts and forthright acknowledgment of

11   potential environmental harms." <u>Nat'l Audubon Soc'y v. Dep't of</u>

12   <u>Navy</u>, 442 F.3d 174, 185 (4th Cir. 2005). "NEPA . . . require[s]

13   that agencies take a 'hard look' at the environmental effects of

14   their planned action." <u>Marsh v. Or. Natural Res. Council</u>, 490

15   U.S. 360, 374 (1989). To satisfy the "hard look" standard

16   "federal agencies must 'carefully consider[] detailed information

17   concerning significant environmental impacts [of the proposed

18   action],' but . . . are not require[d] to do the impractical.'"

19   <u>Klamath-Siskiyou Wildlands Ctr. v. Burea of Land Mgmt.</u>, 387 F.3d

20   989, 992-93 (9th Cir. 2004) (alterations in original) (quotations

21   omitted). "The role of the courts is simply to ensure that the

22   agency has adequately considered and disclosed the environmental

23   impact of its actions and that its decision is not arbitrary or

24   capricious." <u>Balt. Gas & Elec. Co. v. Natural Res. Def. Council</u>,

25   462 U.S. 87, 97 (1983).

26   ///

27   ///

28   ///

16

1        **1.   Snag Baseline Data and Snag Deficits**

2               Plaintiff argues the Forest Service failed to take a

3   "hard look" at whether the number of snags in the Project area

4   met or exceeded the Forest Plan's snag retention standard. (Compl

5   ¶ 62.)

6               All management activities undertaken by the
    Forest Service must comply with the [F]orest
7               [P]lan . . . . [and the Forest Plan must
    address how to] maintain viable populations
8               of native and desired non-native wildlife
    species. In order to ensure compliance with
9               the [F]orest [P]lan . . . the Forest Service
    must conduct an analysis of each "site
10              specific" action, such as a timber sale, to
    ensure that the action is consistent with the
11              [F]orest [P]lan.

12  <u>Rittenhouse</u>, 305 F.3d at 961 (citations omitted).

13              The Forest Plan for Shasta-Trinity Forest states: at "a

14  minimum, snags are to be retained . . . at levels sufficient to

15  support species of cavity-nesting birds at 40 percent of

16  potential population levels . . . [with] an average of <u>1.5 snags</u>

17  <u>per acre</u> greater than 15 inches in diameter and 20 feet in

18  height." (PAR 4480)(emphases added.) As part of the EA for the

19  Project, the Forest Service determined:

20              [a]ll action alternatives [for the Project]
    retain existing snag treatment units at a
21              level that exceeds the Forest Plan standards
    and guidelines for matrix lands and that
22              support species of cavity-nesting birds at 40
    percent of potential population levels. At a
23              minimum, two snags per acre at least 15
    inches in diameter and at least 20 feet in
24              height would be retained and snags will be
    retained in groups where available.

25  (PAR 1259.)

26              Plaintiff argues that the Forest Service relied on

27  "conclusory allegations" when stating the Project will satisfy

28  the Forest Plan snag retention standard, and therefore failed to

17

1    demonstrate that the agency took a "hard look" at the issue. (Pl.

2    Mot. 28:1-7.) Specifically, Plaintiff contends the Forest Service

3    did not disclose the data on which it relied in reaching its

4    conclusion and did not address conflicting 2003 survey results.

5         The Forest Service contends it disclosed data in the EA

6    supporting its conclusion that the Forest Plan snag retention

7    standard was being met and that it was not required to address

8    prior conflicting survey results since those results had "been

9    superseded by more recent and more site-specific evaluations."

10   (Def. Opp'n 15:4-9; 16:10-13; 19:6-20.)

11        The PAR reveals that the Forest Service has conducted

12   several analyses of snag levels in the Forest; relevant here are

13   analyses conducted in 2003 and 2011. The 2003 analysis concluded:

14   "[c]urrent snag levels in the watershed are unknown. Snag

15   distribution is not uniform across the landscape (Snag

16   distribution may be correlated with landtype associations). Snag

17   surveys for existing and past projects . . . indicate that snag

18   levels are lower than Forest Plan minimums." (PAR 4070.) The 2011

19   analysis observed: "snag... habitat continues to increase over

20   time as a result of wildfire events and insect and disease

21   outbreak" and determined that the Project's "[p]roposed treatment

22   units have at least two snags per acre greater than 15 inches dbh

23   [diameter at breast height] . . . [b]ased on unit assessment[s]

24   [conducted] in October 2011." (PAR 1259, 1261.)

25        The Forest Service concluded based on the 2011 survey

26   data that the Project would not reduce snag levels below the

27   Forest Plan snag retention standard, stating:

28            [it] would not reduce the amount of snag...
              habitat at the Forest level (or project

18

level). The extent of reduced snag density is
negligible considering that ongoing snag ...
recruitment from insect and disease activity
would continue across the Forest. Natural
recruitment will also continue within the
project area, only at slower rates than what
is currently occurring.

(PAR 1261.)

Further, the Forest Service opined:

[the Project will] retain all snags 15 inches
in diameter and larger and at least 20 feet
in height . . . with the following [two]
exceptions: . . . If more than 10 snags exist
in a group (snag pocket) retain at least 10.
Snags in excess of 10 in snag pockets in the
coarse woody debris deficit units may be
felled and left only as necessary to meet
large woody material requirements for Soil
Quality Standards. . . . [and] Hazardous
snags (snags that pose a threat to life or
property) may be cut, as necessary for
safety.

(PAR 77.)

The Forest Service's analysis of the 2011 survey data
shows it took a "hard look" at snag levels. The Forest Service
sufficiently disclosed the data on which it relied, stating:
"[p]roposed treatment units have at least two snags per acre
greater than 15 inches dbh . . . . [b]ased on unit assessment[s]
[performed] in October 2011." (PAR 1259.) Further, it was
reasonable for the Forest Service to conclude that snag levels
exceeded the Forest Plan snag retention standard since its most
recent 2011 survey data showed snag levels increased over time
and exceeded the Forest Plan snag retention standard. (PAR 1259,
1261.) It was also reasonable for the Forest Service to conclude
that implementing the Project would not cause snag levels to fall
below the Forest Plan snag retention standard since insect and

19

disease activity continue to recruit new snags and the Project will not log existing snags except where they occur in groups of ten or more or where a snag poses a threat to life or property. (PAR 1261, 77.)

The data and conclusions in the EA demonstrate the Forest Service "carefully consider[ed] detailed information concerning significant environmental impacts" of the Project on snag levels. Klamath-Siskiyou Wildlands Ctr., 387 F.3d at 992 (quotations omitted). Therefore, the Forest Service's motion on this claim is granted and Plaintiff's motion is denied.

### 2.   Remaining "Hard Look" Claims

Plaintiff's remaining "hard look" claims allege the Forest Service did not "adequately analyze":

> (A) the potential for wildfire in the project area as a result of logging; (B) northern spotted owl use of burned forests of all severities; (C) degradation of existing and future northern spotted owl habitat; (D) effects to northern spotted owl prey; (E) barred owls and their effects on the northern spotted owl; (F) the effects of regeneration logging on fire behavior; (G) the effects of wildfire, vegetation, and natural recovery process from logging large diameter trees; (H) the past, present, and reasonably foreseeable cumulative impacts; . . . [and] (J) landings.

(Compl. ¶ 62.)

The Forest Service argues it is entitled to summary judgment on Plaintiff's remaining "hard look" claims since the "EA and its Appendices span over 500 pages," "rest[] upon dozens of individual specialists' reports spanning thousands of more pages" and do not support Plaintiff's allegations. (Def. Mot. 21:27-22:1; 22:1-5.) Plaintiff has not addressed the Forest Service's argument.

1    The Forest Service's motion is granted since it

2  "point[ed] out that there is an absence of evidence to support

3  the [Plaintiff's] case" and Plaintiff failed to come forward with

4  "specific facts showing there is a genuine issue for trial."

5  Soremekun, 509 F.3d at 984.

6    **D.   Failing to Comply with the Forest Plan's**

7    **Snag Retention Standard**

8    Plaintiff argues the Forest Service violated the NFMA

9  by failing to ensure the Project satisfied the Forest Plan snag

10 retention standard. (Pl. Mot. 35:10-21.) The Forest Service

11 contends its analysis was sufficient. (Def. Opp'n 23:22-24.)

12   "It is well-settled that the Forest Service's failure

13 to comply with the provisions of a Forest Plan is a violation of

14 NFMA" and for an agency action to comply with the NFMA, a

15 reviewing court must be "[]able to determine from the

16 [administrative] record that the agency is complying with the

17 forest plan standard[s]." Native Ecosystems Council v. U.S.

18 Forest Serv., 418 F.3d 953, 961-62 (9th Cir. 2005).

19   The Forest Service has shown it complied with the

20 Forest Plan snag retention standard and that it "articulate[d] a

21 rational connection between the facts found and the conclusions

22 reached." Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147,

23 1157 (9th Cir. 2006) abrogated on other grounds by Winter v.

24 Natural Res. Council, Inc., 555 U.S. 7 (2008). Therefore, the

25 Forest Service's summary judgment motion on the NFMA claim is

26 granted and Plaintiff's motion is denied.

27 ///

28 ///

1   **E.   Failing to Prepare an Environmental**

2   **Impact Statement ("EIS")**

3        Plaintiff alleges the Forest Service violated NEPA by

4   failing to prepare an EIS for the Project. (Compl. ¶¶ 70-71.)

5        In 42 U.S.C. § 4332(2)(C), NEPA requires that all

6   federal agencies must include "a detailed statement . . . on the

7   environmental impact of the proposed action" "in every . . .

8   major Federal action[] significantly affecting the quality of the

9   human environment." (emphasis added). "Where an EIS is not

10  categorically required, the agency must prepare an Environmental

11  Assessment to determine whether the environmental impact is

12  significant enough to warrant an EIS." Ocean Advocates v. U.S.

13  Army Corps of Eng'rs, 402 F.3d 846 864 (9th Cir. 2004). If, after

14  preparing an EA, the agency concludes an EIS is not required, it

15  must put forth "a convincing statement of reasons that explain[s]

16  why the project will impact the environment no more than

17  insignificantly." Id. "An agency's decision not to prepare an EIS

18  will be considered unreasonable if the agency fails to 'supply a

19  convincing statement of reasons why potential effects are

20  insignificant.'" Save the Yaak Comm. v. Block, 840 F.2d 714, 717

21  (9th Cir. 1988) (quoting The Steamboaters v. FERC, 759 F.2d 1382,

22  1393 (9th Cir. 1985)).

23       The term "significantly" is explained in 40 C.F.R. §

24  1508.27 as requiring consideration of the intensity of the

25  proposed action's impact. 40 C.F.R. § 1508.27(b)(1)-(10)

26  identifies "intensity factors" an agency must consider when

27  evaluating a Project's impact, including inter alia:

28       (5) the degree to which the possible effects
         on the human environmental are highly

22

1               uncertain or involve unique or unknown risks;
. . . and (9) "the degree to which the action

2               may affect an endangered or threatened
species or its habitat that has been

3               determined to be critical under the
Endangered Species Act of 1973.

4

5         An EIS is not required each time an "intensity factor"

6  is implicated; instead it is only required if the "degree to

7  which an action may adversely affect" one of the intensity

8  factors is significant. <u>Envt'l Prot. Info. Ctr. v. U.S. Forest</u>

9  <u>Serv.</u>, 451 F.3d 1005, 1012 (9th Cir. 2006).

10        The Forest Service considered the "intensity factors"

11  in the EA and concluded that "an environmental impact statement

12  will not be prepared" because the Project "will not have a

13  significant effect on the quality of the human environment,

14  considering the . . . intensity of impact[]." (PAR 25.)

15        **1.   Significant Effects on the Northern Spotted Owl**

16        Plaintiff argues NEPA required the Forest Service to

17  prepare an EIS for the Project since it will have a significant

18  impact on northern spotted owls by logging "within . . . critical

19  [northern spotted owl] habitat." (Pl. Mot. 31:5-9.)

20        The Forest Service responds that the Project will not

21  have a significant impact on critical owl habitat since the

22  Project will improve treated foraging and dispersal habitat and

23  "any impact the Project[] . . . [is] expected to have on northern

24  spotted owl habitat [is] . . . predicted to be beneficial over

25  the long-term even though in the short-term, there would be some

26  habitat elements reduced." (Def. Opp'n 22:9-24.)

27        The Forest Service addressed the Project's impact on

28  northern spotted owl habitat in the EA, stating in relevant part:

1
2
3
4
5
6
7
8
9
10

> Approximately 137 acres of foraging habitat..., 23 acres of dispersal habitat..., and 41 acres of capable habitat . . . are proposed for treatment . . . . Given that: 1) treatments are not proposed within nesting/roosting habitat or high-quality foraging habitat and, 2) treatments within 137 acres of foraging habitat will not remove primary constituent elements of critical habitat because they have been designed to retain the current function of foraging habitat following treatment, and 3) treatments in dispersal and capable habitat will not significantly affect [northern spotted owl] dispersal through the [P]roject area, the [Forest] Service determines that the Project may affect, but is not likely to adversely affect designated critical habitat in the action area.

11

(PAR 371.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Forest Service adequately explained that the Project will not have a significant impact on northern spotted owl habitat since it will not log in areas that serve as "nesting/roosting habitat or high-quality foraging habitat," and that in the areas where the Project intersects northern spotted owl foraging and dispersal habitat, the logging will not interfere with the owl's use of the land. (PAR 371.) This provides "a convincing statement of reasons explaining why the project will impact [the spotted owls critical habitat] no more than insignificantly," even though it proposes logging in 201 acres of northern spotted owl habitat. Ocean Advocates, 402 F.3d at 864. Since the Forest Service's conclusion that the Project would not have a significant impact on critical owl habitat was not arbitrary or capricious, no EIS was required. Therefore, the Forest Service's motion on this claim is granted and Plaintiff's motion is denied.

28

///

1              **2.    Highly Uncertain or Unknown Risks to Northern**

2                      **Spotted Owls**

3              Plaintiff additionally argues an EIS was required since

4    the Project aims to support northern spotted owls by reducing the

5    risk of wildfire yet, "there is significant uncertainty as to

6    whether [the prevention of wildfire] . . . is beneficial or

7    adverse to the northern spotted owl." (Pl. Mot. 31:21-32:2.)

8              The Forest Service acknowledges "some uncertainty as to

9    the extent to which northern spotted owls used burned forest to

10   forage" but argues "the effects of the Project as a whole . . .

11   are [not] highly uncertain" since "[t]here is no serious

12   uncertainty that . . . . the loss of nesting and roosting habitat

13   from catastrophic wildfire remains among the primary threats to

14   the survival of the owl." (Def. Reply 12:22-13:7.)

15             The "scientific uncertainty" concerning northern

16   spotted owls' use burned habitat is addressed in the EA where the

17   Forest Service states in relevant part:

18             While it has been shown that California
                 spotted owls show an apparent preference for
19               foraging in burned areas of all severities
                 (Bond, et al., 2009) the author attributed
20               the majority of these results to the
                 likelihood that post-burn use by owls is
21               associated with an "increased abundance or
                 accessibility of prey." The . . . study also
22               noted that while California spotted owls
                 foraged in all burn severity areas (and may
23               have preferred high-severity burn areas) they
                 avoided high and moderate severity areas for
24               roosting, and presumable nesting.

25   (PAR 143.)

26             The Forest Service states in the PAR that this research

27   calls into question conventional wisdom that northern spotted

28   owls do not prefer high-severity burn areas for <u>foraging</u>, but

does not suggest the owls prefer high-severity burn areas for roosting. (PAR 143.) The distinction is important because the Revised Recovery Plan for the northern spotted owl states that one of "the most important . . . threats to [the species is] ... habitat loss or degradation from [high-severity] stand replacing wildfire." (PAR 27416) (emphasis added.) Stand replacing wildfire "reset[s] [northern spotted owl habitat] to an early-seral stage with small tree size and large openings that would be unsuitable for [northern spotted owl] nesting, roosting, foraging and dispersal." (PAR 143.) Plaintiff offers no evidence to refute this.

Scientific controversy over whether northern spotted owls prefer to use severely burned forests is not relevant to the question whether wildfire's overall effect on the northern spotted owl is highly uncertain since stand replacing wildfire "reset[s]" the Forest and produces habitat containing "small tree size and large openings that would be unsuitable" for the northern spotted owl. (PAR 143.) These stand replacing fires eliminate rather than create new northern spotted owl habitat and the Project is designed to "reduc[e] the risk of [just such] catastrophic fire[s]." (PAR 370.) Since uncertainty over whether northern spotted owls prefer to forage in burned habitat does not raise concerns as to whether the Project's overall effect on the owls would be highly uncertain, no EIS was required. Barnes v. U.S. Dep't of Transp., 655 F.3d 1124, 1140 (9th Cir. 2011) ("An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain").

///

1     Therefore, the Forest Service's motion is granted and

2  Plaintiff's motion is denied.

3                        **IV.  Conclusion**

4     For the stated reasons, Plaintiff's summary judgment

5  motion is DENIED and the Forest Service's summary judgment motion

6  is GRANTED. The Clerk of the Court shall enter judgment in favor

7  of the Forest Service and close this action.

8  Dated:  March 20, 2015

9

10  _____

11  GARLAND E. BURRELL, JR.
    Senior United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              27